**[Cite as *State v. Avery*, 2024-Ohio-1642.]**

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ROSS COUNTY

| | | |
|---|---|---|
| State of Ohio, | : | Case No.  23CA12 |
| Plaintiff-Appellee, | : | <u>DECISION AND</u> <u>JUDGMENT ENTRY</u> |
| v. | : | |
| Shane Donahue Avery, | : | |
| Defendant-Appellant. | : | **RELEASED 4/26/2024** |

_____

<u>APPEARANCES</u>:

Max Hersch, Assistant State Public Defender, Columbus, Ohio, for appellant.

John W. Judkins, Assistant Law Director, Chillicothe, Ohio, for appellee.

_____

Hess, J.

**{¶1}**   Shane Donahue Avery appeals from a judgment of the Chillicothe Municipal Court convicting him, following a jury trial, of one count of operating a vehicle under the influence of alcohol, a drug of abuse, or a combination of them ("OVI").  Avery presents one assignment of error asserting that his conviction was against the manifest weight of the evidence.  For the reasons which follow, we overrule the assignment of error and affirm the trial court's judgment.

## I.  FACTS AND PROCEDURAL HISTORY

**{¶2}**    Avery was cited with OVI in violation of R.C. 4511.19(A)(1)(a).  He pleaded not guilty. He filed a motion to suppress which the trial court overruled after a hearing. The matter proceeded to a jury trial.

### A.  Trooper Draper's Testimony

**{¶3}**    Trooper Kelsey Draper of the Ohio State Highway Patrol testified that the night of May 29, 2022, in Chillicothe, Ohio, she observed a vehicle which was travelling southbound on Brownell Street turn right onto Main Street. As the vehicle turned, it traveled over the center line by about a tire width. She initiated a traffic stop.  Avery was the driver of the vehicle, and he had a passenger. When Trooper Draper initially approached the vehicle, she did not smell anything.  She "leaned into the vehicle a little bit more" to get Avery's license, and she smelled the odor of an alcoholic beverage and burnt marijuana.  Trooper Draper observed that Avery's eyes were bloodshot and glassy. She also observed that he was "very talkative" but acknowledged that alone is not an indication of impairment and "could just be part of someone's personality." Trooper Draper testified that Avery admitted "to consuming alcoholic beverages earlier in the day" and "to smoking marijuana quite frequently."  She asked him to step outside of the vehicle. She noticed some "odd behaviors"—he was "kind of in a euphoric state," "kind of swaying" while walking, and "didn't put his shoes on."  She testified that "[a] normal person under those circumstances wouldn't be so relaxed."  However, she acknowledged that taking off one's shoes is "[n]ot necessarily" an indication of impairment.  As she spoke to Avery more, she could smell the odor of an alcoholic beverage and burnt marijuana coming from his person.

{¶4} Trooper Draper performed three standardized field sobriety tests: the horizontal gaze nystagmus test, the walk-and-turn test, and the one-leg stand test. Trooper Draper testified that she observed 4 of 22 standardized clues during the tests. She testified that horizontal gaze nystagmus ("HGN") "is the involuntary jerking of our eyes" which is "not really visible to the naked eye unless we consume a substance essentially that slows it down or there is certain type of medical conditions [sic] that can cause it as well." Trooper Draper testified that the HGN test "kind of pertains more to alcohol and certain drug categories more than marijuana." Before performing the HGN test, she did a pre-test and did not observe anything of note. Trooper Draper testified that the HGN test has "three clues for each eye, for a total of six." She observed two clues, one for each eye—a lack of smooth pursuit when she moved her finger across his face. She did not observe any nystagmus. When asked if "nystagmus is the greatest indication of being influenced by alcohol," she testified: "Alcohol, depressants. You have also got other types of drugs that it can be seen in."

{¶5} Trooper Draper observed one of eight clues on the walk-and-turn test— Avery raised his arms over six inches for balance. Trooper Draper also testified that Avery "had a hard time following the instructions" for the test and looked straight ahead instead of down at his feet like he was told to do. On cross-examination, she acknowledged Avery could have been expressing "disbelief" when he raised his arms too high during the test. Trooper Draper observed one clue during the one-leg stand test—Avery raised his arms over six inches from his sides. She also testified that during the test one is supposed to raise a foot about six inches above the ground. She testified that Avery "barely had his foot off the ground, maybe an inch, two inches," and she had to tell him to raise it.

**{¶6}** She looked inside Avery's mouth and observed a green film on his tongue and that the glands at the back of his throat were red and raised. She testified that smoking causes glands at the back of the throat to become red and inflamed and that when one smokes marijuana, "a green product, some of that film from the substance * * * will actually stick to the back [of] your tongue and your gland area." Trooper Draper also checked Avery's reaction to light. She testified that when a light is shined in one's eyes, the pupils naturally get and stay small. If one has used marijuana, the pupils get bigger instead. She testified that Avery had "rebound dilation" in both eyes—his pupils got larger the longer she kept the light in his eyes, which "kind of is consistent with marijuana impairment" and "other types of drugs."

**{¶7}** Trooper Draper performed a lack-of-convergence test, which she testified is not a standardized test as it "is relatively new" and has not been the subject of as many studies as the standardized tests for alcohol impairment. Using only his eyes, Avery was to follow her fingertip as she moved it around his face and held it by the bridge of his nose for a few seconds. Trooper Draper testified that the eyes are supposed to "converge," but if the person has consumed drugs or has certain medical issues, their eyes will not converge, or one or both eyes will "bounce back out." Trooper Draper testified that Avery's "left eye kicked out" during the test. She also performed the modified Romberg balance test, a skill evaluation which involves estimating the passage of time. She testified that alcohol and marijuana slow down one's estimation of time and that Avery thought 30 seconds passed in 43 seconds. During the test, she walked around Avery while shining a light on him to check for eye lid and body tremors, which use of marijuana and other types of drugs can make visible. Avery's "eye lids were tremoring."

{¶8}     Trooper Draper testified about a few exchanges between her and Avery on video footage from the traffic stop.  In one exchange, Trooper Draper says, "So you live in Chillicothe now?" and Avery says, "I, I'm, uh, residing with my brother in Lickskillet, uh, Dallas, my younger brother.  I, my home, I lost my home in Tennessee." On direct examination, Trooper Draper testified that Avery "didn't really understand my question.  It seemed like he just kind of went off in his own world and started speaking oddly." On cross-examination, she testified that Avery answered her question.  In another exchange, Trooper Draper asks Avery if flashing lights have ever caused him to have seizures. Avery says, "No, and later adds, "I have an ambulance," and laughs. On direct examination, Trooper Draper testified that having an ambulance did not have anything to do with her questioning.  When asked if Avery's non-responsiveness to some questions indicated anything to her, she testified that "when we consume alcohol, certain drugs and stuff like that, it kind of diminishes our attention span.  It makes it hard to focus on multiple things at one time." On cross-examination, defense counsel said, "[I]t's probably reasonable for [Avery] to state that he's okay with flashing lights because he owns an ambulance.  It's not off topic."  Trooper Draper responded, "It's just a little odd."  In another exchange, Trooper Draper asks Avery if he has been drinking, and he says, "Probably fucking three hours ago." Later she asks the last time he smoked weed, and Avery says, "Probably two hours ago."  On direct examination, Trooper Draper suggested that Avery gave inconsistent answers to these questions, which indicated he was "having a hard time judging time" and was "kind of * * * being untruthful."  She testified, "I don't think he recalled what he actually told me to begin with."

{¶9}    Trooper Draper testified that "[b]ased on the totality of everything that [she] observed," she believed Avery was under the influence. She arrested him. Trooper Draper testified that Avery asked her to get his cell phone. She went into his vehicle and found a partially burnt marijuana cigarette under the driver's seat. She did not know when it had been smoked. Trooper Draper testified that when she transported Avery to the patrol post, he was "really moody. He would be happy, giddy, kind of giggly, and then * * * kind of belligerent. His mood was just up and down constantly. That is an indicator of drug, alcohol use and stuff like that." She testified that at one point Avery was "getting off track again and talking randomly." At another point, he "kind of drift[ed] off in what he's saying," his speech got slower, and it sounded like he was about to fall asleep. She also testified that throughout her interaction with Avery, he "just kept stroking his beard" which she found odd under the circumstances.

## B.  Video Footage

{¶10}  On the video footage, about a minute elapses between the traffic violation and traffic stop. When Trooper Draper tells Avery the reason for the stop, he says, "Big ass car, isn't it?" and laughs. Avery gives Trooper Draper his license, and she asks if he is from Tennessee. He says, "Within reason. I've lived here for 33 years." He says something about "14 years," that he is "satelliting from out Lickskillet way," and "I have a P.O. Box there still." Trooper Draper asks if Avery has his vehicle registration, and Avery says, "I'm just moving everywhere up and back. Um, I don't know if I got the registration." When asked if he had been drinking, Avery says, "Probably fucking three hours ago," as he eats a sandwich. Avery exits the car upon Trooper Draper's request. Trooper Draper tells the passenger to stay in the car. Avery laughs and says, "That's not my girlfriend."

Avery evidently takes his shoes off, and Trooper Draper asks whether he wants to put his shoes on. Avery says that he only wears them to drive. Trooper Draper asks Avery to walk to the back of her cruiser. While he does, there is a point where he seems to shift slightly to the side and back.

{¶11} Trooper Draper asks Avery, "So you live in Chillicothe now?" Avery says, "I, I'm, uh, residing with my brother in Lickskillet, uh, Dallas, my younger brother. I, my home, I lost my home in Tennessee." Trooper Draper asks if he is "just kind of in between right now?" He says, "Yes," and then says that he gets his daughter every other weekend in Tennessee, so he has "a P.O. Box there." Trooper Draper asks Avery if he has smoked any marijuana tonight. Avery says, "Oh yeah, definitely." Avery says it was "long enough ago to where I'm happy to be okay at the wheel though because I mean, I do carry a car seat" and laughs. Trooper Draper asks Avery how much he has had to drink. Avery says, "Oh, Jesus, uh, all day long?" Trooper Draper says, "Yeah, pretty much." Avery says, "Four." Avery indicates he drank beer. Avery then tells Trooper Draper that he is visiting his friend George, his passenger, and took him to get something to eat. Avery tells Trooper Draper that he takes George's "dog for rides too" and laughs.

{¶12} Trooper Draper asks Avery if he takes any prescription medication, and he says, "No." Trooper Draper asks if Avery has any physical issues, and he tells her that his shoulders have been "torn out" but are "back in line." At one point, Trooper Draper asks if Avery had any recent head injuries. Avery tells her that his head was "pasted" back together "in 21" after he was "beaten with some boat oars," but he is "alright now" and feels "pretty good." Trooper Draper asks if Avery has any neurological disorders. Avery tells her that he is on 100% disability due to a central nervous disorder from his

service in Kuwait, but he is "doing alright with it." He says that "the cannabis helps" and talks about other servicemen using gabapentin, which limits mobility and does not help them heal. Trooper Draper asks if Avery has an ear infection, and he reports a right ear infection. Trooper Draper asks Avery if he suffers from epilepsy. Trooper Draper then asks if flashing lights have ever caused him to have seizures. Avery says, "No, and later adds, "I have an ambulance," and laughs.

{¶13} After some testing, Trooper Draper asks Avery the last time he smoked weed. Avery says, "Probably two hours ago." He says, "Don't have any on us. Noth…Nothing here. So I just usually carry enough to get me through my little trip." He tells Trooper Draper that he typically smokes three or four joints a day. Trooper Draper asks if Avery smokes meth. Avery says that he does not, that he has "zero cavities at 54," and laughs. He then says, "Matter of fact, where my grandfa… where, where the Rally's is, is where my grandfather's gas station was. That's why this man looks so familiar. And H&H Automotive right here next to Crall's. That's … that's what we were just talking about as we made a loop. We went, you know, up north Bridge and then made a, a fun way back but encountered you. But we were just talking about my grandfather's station over here."

{¶14} Trooper Draper later explains the walk-and-turn test, including the fact that that Avery should keep his hands down at his sides and look at the tip of his lead foot. During the test, Trooper Draper tells him to look at his foot. He says, "Why do I have to look at it I know where I'm going." While making this statement, he raises his arms a little, lifts his left arm up more, and gestures forward. Avery puts his arms down, and Trooper Draper says he needs to look at his foot like she showed him. Avery continues walking

and raises his arms up saying, "You have to stare at them?" He then puts his arms down again and finishes the test. When Trooper Draper explains the one-leg stand test, she tells Avery to raise one foot off the ground about six inches and keep his hands at his sides. When the test begins, Avery immediately lifts his arms up away from his sides. Trooper Draper tells him to put his hands at his sides and raise his foot a little higher. When Trooper Draper explains the modified Romberg balance test, she tells Avery that he will keep his eyes closed until he thinks 30 seconds has passed. During the test, Avery asks, "With my eyes closed the whole time?" Later in the footage, Avery refuses to take a urine test.

## C. Avery's Testimony

{¶15} Avery testified that he served in the Marines and that he traveled from Tennessee to pick up his friend George so that they could "tidy up some mounds" or "grave sites" during Memorial Day weekend. At one point, they got something to eat, and Avery started driving them back to George's house. Avery pulled onto Main Street and "felt the wide right because that's kind of how long the car is." Avery testified that he was in a big car—a 1994 Lincoln which he thought had a 17½ foot long wheelbase. Avery testified that he felt comfortable driving despite drinking and smoking cannabis earlier. He denied smoking the day of trial.

## D. Verdict

{¶16} The jury found Avery guilty of OVI.[1] The trial court sentenced him, and this appeal followed.

---

[1] Evidently Avery was also charged with the marked-lanes violation in a separate case, and the trial court found him guilty.

## II.  ASSIGNMENT OF ERROR

{¶17} Avery presents one assignment of error:  "Shane Avery's conviction for driving while under the influence was against the manifest weight of the evidence."

## III.  LAW AND ANALYSIS

{¶18} In his sole assignment of error, Avery contends that his conviction was against the manifest weight of the evidence. In determining whether a conviction is against the manifest weight of the evidence, an appellate court

> must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that reversal of the conviction is necessary. In order to satisfy this test, the state must introduce substantial evidence on all the elements of an offense, so that the jury can find guilt beyond a reasonable doubt.
>
> Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence. However, we are reminded that generally, it is the role of the jury to determine the weight and credibility of evidence.  " 'A jury, sitting as the trier of fact, is free to believe all, part or none of the testimony of any witness who appears before it.' " *State v. Reyes-Rosales*, 4th Dist. Adams No. 15CA1010, 2016-Ohio-3338, ¶ 17, quoting *State v. West*, 4th Dist. Scioto No. 12CA3507, 2014-Ohio-1941, ¶ 23.  We defer to the trier of fact on these evidentiary weight and credibility issues because it is in the best position to gauge the witnesses' demeanor, gestures, and voice inflections, and to use these observations to weigh their credibility.

(Citations omitted.) *State v. Anderson*, 4th Dist. Highland No. 18CA14, 2019-Ohio-395, ¶ 14-15.  " 'Ultimately, a reviewing court should find a trial court's decision is against the manifest weight of the evidence only in the exceptional case where the evidence weighs heavily against the decision.' "  *State v. Allen*, 4th Dist. Ross No. 21CA3736, 2022-Ohio-1180, ¶ 27, quoting *State v. Gillian*, 4th Dist. Gallia No. 16CA11, 2018-Ohio-4983, ¶ 28, citing *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 330.

**{¶19}** R.C. 4511.19(A)(1)(a) states: "No person shall operate any vehicle * * * within this state, if, at the time of the operation, * * * [t]he person is under the influence of alcohol, a drug of abuse, or a combination of them." The trial court instructed the jury:

> "Under the influence" means that Shane Avery consumed some alcohol or drug of abuse or both, whether mild or potent, in such a quantity, whether small or great, that it adversely affected and noticeably impaired his actions, reactions or mental processes under the circumstances then existing, and deprived him of clearness of the intellect and control of himself which he would otherwise have possessed.
>
> The question is not how much alcohol or drugs would affect an ordinary person. The question is what effect did any alcohol or drugs consumed by Shane Avery have on him at the time and place involved.
>
> If the consumption of alcohol or drugs so affected the nervous system, brain, or muscles of Shane Avery as to impair to a noticeable degree his ability to operate the vehicle, then he was under the influence.

The court instructed the jury that marijuana is a drug of abuse. In addition, the court instructed the jury:

> Evidence has been introduced indicating that Shane Avery was asked but refused to submit to a chemical test of his urine to determine the amount of marijuana in his system for the purpose of suggesting that he believed that he was under the influence.
>
> If you find that Shane Avery refused to submit to the test, you may, but you are not required to, consider this evidence along with all of the other facts and circumstances in evidence in deciding whether he was under the influence.

### A. Case Law

**{¶20}** Avery asserts that *State v. Kopp*, 2017-Ohio-4428, 93 N.E.3d 199 (5th Dist.); *State v. King*, 4th Dist. Athens No. 18CA5, 2018-Ohio-4929; and *State v. Cohen*, 1st Dist. Hamilton No. C-220354, 2023-Ohio-1643, are "instructive as to why the jury lost its way in this case."

### 1. *State v. Kopp*

**{¶21}** In *Kopp*, a trooper stopped a vehicle because the rear license-plate light was out, and the registered owner had an expired Ohio license. *Kopp* at ¶ 3. The trooper observed no traffic violations. *Id.* at ¶ 4. The trooper smelled the odor of fresh marijuana and an alcoholic beverage coming from the vehicle. *Id.* at ¶ 5. The driver admitted that he smoked marijuana earlier. *Id.* The trooper asked if the driver had anything to drink but did not hear his response. *Id.* The driver's eyes were very glassy and somewhat bloodshot, and his pupils were dilated. *Id.* at ¶ 5, 8. The driver exited the vehicle without incident, and the trooper observed seven clues during three standardized field sobriety tests. *Id.* at ¶ 6, 8. The trooper also determined the driver failed the lack-of-convergence test because his right eye did not converge and drifted right twice. *Id.* at ¶ 10. The driver correctly said the alphabet and counted backward from 69 to 57. *Id.* at ¶ 11. The driver was arrested and cited for OVI. *Id.* at ¶ 12-13. The trial court granted his motion to suppress, concluding there was not probable cause for the arrest. *Id.* at ¶ 14, 21.

**{¶22}** The Fifth District affirmed. *Id.* at ¶ 27. The court stated that after reviewing footage of the stop, "we agree [the driver] exhibited no impaired driving; spoke to the officer calmly, politely, and intelligibly when audible; exited the truck without incident; submitted to the field sobriety tests without incident and generally exhibited no visible signs of impairment." *Id.* at ¶ 21. The Fifth District found that the odor of raw marijuana emanating from the vehicle, driver's admission to having smoked marijuana, and clues observed on the standardized field sobriety tests and lack-of-convergence test provided reasonable suspicion for the trooper to investigate further, but those facts did not provide probable cause for the arrest. *Id.* at ¶ 22.

## 2. *State v. King*

{¶23} In *King*, a trooper initiated a traffic stop for a speeding violation. *King*, 4th Dist. Athens No. 18CA5, 2018-Ohio-4929, ¶ 3. The driver only partially rolled her window down, which was atypical. *Id.* at ¶ 5. There was marijuana debris on the floorboards and an odor of raw marijuana emanating from the vehicle. *Id.* The driver had reddened conjunctiva, raised taste buds, and a green streak on her tongue, which the trooper knew to be signs that someone may be under the influence of marijuana. *Id.* at ¶ 5-6, 8. The driver admitted that there had been marijuana in the vehicle and that she had smoked marijuana about three hours earlier. *Id.* at ¶ 5-6. The trooper observed two clues on the walk-and-turn test, two clues on the one-leg stand test, and no clues on the HGN test. *Id.* at ¶ 9. The driver displayed a lack of convergence, was 12 seconds off in estimating the passage of time during the modified Romberg test, and had eyelid tremors during that test. *Id.* at ¶ 9, fn. 2. The driver's eyelids were droopy, and her pupils were dilated. *Id.* at ¶ 10. According to the trooper, she "appeared 'very relaxed and just acted * * * like she was still under the effects of cannabis.' " *Id.* The trooper asked if the driver felt like she was still under the influence of marijuana, and the driver said " 'maybe a little.' " *Id.* The trooper arrested her and got a urine sample, which contained greater than two hundred nanograms per milliliter of marijuana metabolites. *Id.* at ¶ 11. The trial court did not believe the field sobriety tests could be used to show the driver likely would test above a prohibited level of marijuana metabolite due to the lack of scientific studies, concluded the trooper did not have probable cause to arrest her for marijuana impaired OVI, and suppressed the urine test results. *Id.* at ¶ 12.

**{¶24}** We reversed the trial court's decision in a 2-1 decision. *Id.* at ¶ 22. We explained that even if we assumed, without deciding, that the field sobriety tests "should be discredited in this context," the following factors, considered together, gave probable cause for the arrest:

> (1) King was travelling in excess of the stated speed; (2) King only partially rolled her window down, which is atypical; (3) King had reddened conjunctiva, as well as raised taste buds and a green film of her tongue – all signs that King had consumed marijuana; (4) King admitted to smoking marijuana approximately three hours earlier; (5) King seemed very relaxed and acted as if she was under the influence of marijuana; (6) King stated that she was "maybe a little" under the influence; (7) Trooper Nihiser observed droopy eyes, eyelid tremors, and dilated eyes; and (8) Trooper Nihiser smelled the odor of raw marijuana emanating from King's vehicle and saw marijuana debris on the floorboard.

*Id.* at ¶ 19-20. The concurring judge believed that "the trial court properly discounted the propriety of using field tests as a reliable measure of a defendant's probability of testing above prohibited levels of marijuana" but that there was still probable cause "[f]or the reasons expressed in the principal opinion." *Id.* at ¶ 23, 28 (Harsha, J., concurring). The dissenting judge, analogizing the case to *Kopp*, would have affirmed. *Id.* at ¶ 29-38. (Hoover, J., dissenting).

### 3. *State v. Cohen*

**{¶25}** In *Cohen,* an officer initiated a traffic stop after observing a vehicle speeding and weaving across lane lines. *Cohen*, 1st Dist. Hamilton No. C-220354, 2023-Ohio-1643, at ¶ 3. The officer noticed that the driver's breath smelled like alcohol, her eyes were red and watery, and her speech was slurred. *Id.* at ¶ 4. She denied drinking. *Id.* at ¶ 6. The officer observed nine clues on three field sobriety tests (three on the walk-and-turn test, six on the HGN test, and none on the one-leg stand test) and that the driver missed a number in her vocal count during the one-leg stand test. *Id.* at ¶ 5. The driver

refused to take a chemical test.  *Id.* at ¶ 6.  The trial court found her guilty of OVI, speeding, and a marked-lanes violation.  *Id.* at ¶ 7.

{¶26} The First District concluded that the OVI conviction was not against the manifest weight of the evidence and affirmed the trial court's judgment.  *Id.* at ¶ 1.  The appellate court found that even though the video footage did not clearly illustrate the driver's slurred speech, red, watery eyes, or the nystagmus clues, the footage did not undermine the trial court's judgment.  *Id.* at ¶ 13.  The officer explained that the low quality of the footage failed to capture those indicators of intoxication, and the trial court was in the best position to evaluate witness credibility.  *Id.*  The appellate court also rejected the contention that the trial court assigned too much weight to the driver's refusal to take a chemical test.  *Id.* at ¶ 14.  The appellate court explained that the trial court had discretion to consider that fact and that the trial court also considered testimony that the driver's breath smelled of alcohol, that she had red, glassy eyes, that she drove erratically, and that she exhibited nine clues on the field sobriety tests.  *Id.*

### B.  Avery's Arguments

{¶27} Avery contends the jury lost its way when it concluded that he was under the influence, particularly when the video footage is considered. Avery maintains that Trooper Draper's testimony was "internally contradictory." He asserts that Trooper Draper testified that he did not understand her question about whether he was from the Chillicothe area but later admitted he answered her question. He asserts that Trooper Draper also testified that his comment about having an ambulance was unrelated to her questioning but later "did not deny" the comment was on topic because she had asked about flashing lights.  Avery also notes Trooper Draper testified that he gave inconsistent

answers about when he last used marijuana, but the video footage shows he told her that he used marijuana two hours before the stop and alcohol three hours before the stop.

**{¶28}** In addition, Avery asserts that many of Trooper Draper's observations "do not necessarily indicate impairment, even by her own admission." He notes Trooper Draper testified that he was more relaxed than a normal person, "kind of in a euphoric state," "kind of swaying," and did not put shoes on, but he asserts she testified these things were odd, not signs of impairment. He asserts the observation that he was "kind of swaying" while walking from his car to the cruiser is contradicted by the video footage and that it is unclear what about his behavior indicated euphoria. He notes Trooper Draper admitted being talkative could be part of someone's personality. He claims the fact that his testimony "sometimes went beyond the scope of the question" and that he "testified that he had not smoked marijuana" the day of trial is evidence that his talkativeness was not due to impairment. He also asserts that Trooper Draper never testified that him rambling, nodding off, or drifting in and out of conversation were "necessarily signs of impairment," and he asserts that being tired at a late hour is not evidence of impairment.

**{¶29}** Avery maintains that he exhibited no impaired driving despite committing a marked-lanes violation because Trooper Draper "did not observe any further traffic violations even after following [him] for about a minute." He asserts the record shows that he was forthcoming and cooperative, admitted that he smoked marijuana and drank alcohol earlier but felt safe to drive, exited his vehicle calmly and without incident, gave a detailed medical and personal history when asked, submitted to all requested field-sobriety tests, and generally exhibited no visible signs of impairment. He claims that

because Trooper Draper did not explain how clues on the non-standardized tests help in assessing impairment, we should discount the weight of those observations. He asserts that Trooper Draper's observation of bloodshot and glassy eyes, the odor of marijuana and alcohol, his admission to smoking and drinking earlier, and 4 standardized clues out of 22 on the field sobriety tests are insufficient to support his conviction.

**{¶30}** In addition, Avery contends that the testimony and video evidence in this case "mirror *Kopp* and are distinguishable from *King* and *Cohen*." He suggests this case is like *Kopp* because both involve a period of driving without traffic violations, an odor of marijuana and alcohol, bloodshot and glassy eyes, a driver who spoke calmly, politely, and intelligibly when audible, a driver who exited a vehicle and submitted to field sobriety tests without incident, observation of few clues on those tests (seven in *Kopp* and four in this case), and abnormal eye behavior on the lack-of-convergence test. He asserts that this case is distinguishable from *King* because he fully rolled his window down, exited his car without incident, cooperated with law enforcement, did not admit to feeling under the influence, and said that he felt comfortable driving. He also asserts that unlike the trooper in *King,* Trooper Draper never testified that his "demeanor reflected marijuana or drug use." Rather, "her statements about his demeanor were initially qualified and then further minimized on cross-examination." Avery asserts this case is distinguishable from *Cohen* because he did not commit multiple traffic violations, did not have slurred speech, and exhibited only four clues in three field sobriety tests. He also claims the video footage in *Cohen* "did not undermine or cast doubt upon the trial court's verdict, whereas inconsistencies—with or without the body-camera footage—are apparent here." *Id.*

C.  Analysis

{¶31} Our review of the record reveals that the state introduced substantial evidence from which the jury could conclude, beyond a reasonable doubt, that Avery operated a vehicle under the influence of alcohol, a drug of abuse, or a combination of them.  There is evidence that Avery committed a marked-lanes violation.  He admitted to using marijuana and alcohol a few hours earlier.  Trooper Draper smelled the odor of burnt marijuana and alcohol coming from his person.  Although Avery suggested he did not have any marijuana with him, there was a partially burnt marijuana cigarette under the driver's seat.  Trooper Draper observed Avery had bloodshot and glassy eyes.  She also saw abnormal eye behavior during the lack-of-convergence test, an indicator of drug use.  She saw a green film on Avery's tongue—an indicator of marijuana use.  She also observed indicators that Avery's body was still being affected by his marijuana use—the glands at the back of his throat were red and raised, he exhibited rebound dilation in both eyes, and he had eyelid tremors.  Trooper Draper observed four clues on the standardized field sobriety tests.  In addition, Avery thought 30 seconds passed in 43 seconds on the modified Romberg balance test, which was consistent with alcohol and marijuana use as they slow one's perception of time.  Avery also refused to take a urine test, which the jury could consider as evidence that he believed he was under the influence.

{¶32} Trooper Draper testified that alcohol and other drugs diminish one's attention span, and there is evidence that Avery had a diminished attention span.  There is evidence he did not follow all test instructions.  At times, he made unsolicited statements which were entirely unrelated to the traffic stop, like the statements about taking his friend's dog for rides and about his grandfather's gas station.  In addition, at

times, he provided unnecessary information while responding to straightforward questions. For example, when asked if he had his vehicle registration, Avery says, "I'm just moving everywhere up and back," before saying, "I don't know if I got the registration." When asked if he lives in Chillicothe now, Avery says that he lives with his brother Dallas in Lickskillet and lost his home in Tennessee. When asked whether flashing lights ever caused him to have seizures, Avery says, "No," but then adds, "I have an ambulance," and laughs. Regardless of how one interprets Trooper Draper's testimony about some of these exchanges, Avery's answers reflect a lack of focus on the specific questions asked.

{¶33} Trooper Draper testified that Avery was "really moody" during the ride to the patrol post, which was an indicator of drug and alcohol use. She also testified that Avery exhibited odd behaviors during her encounter with him. Trooper Draper did not specifically testify that these behaviors were indicative of alcohol or marijuana impairment. However, they are part of the circumstances she observed, and Trooper Draper testified that "[b]ased on the totality of everything that [she] observed," she believed Avery was under the influence. Trooper Draper did not elaborate on why she thought Avery was "kind of in a euphoric state," but her opinion may have related to him laughing at times. And while unclear, her testimony about him "kind of swaying" while walking to the back of her cruiser might pertain to the point in the footage where Avery seems to shift slightly to the side and back.

{¶34} Although Trooper Draper incorrectly indicated that Avery gave inconsistent answers in response to questions about when he last used alcohol and marijuana, and one might disagree with her characterization of Avery as "kind of in a euphoric state" or

"kind of swaying," that does not make all her testimony inherently incredible. Again, a jury " ' "is free to believe all, part, or none of the testimony of any witnesses who appears before it." ' " *Anderson*, 4th Dist. Highland No. 18CA14, 2019-Ohio-395, at ¶ 15, quoting *Reyes-Rosales*, 4th Dist. Adams No. 15CA1010, 2016-Ohio-3338, at ¶ 17, quoting *West*, 4th Dist. Scioto No. 12CA3507, 2014-Ohio-1941, at ¶ 23. Even if the jury did not believe some of Trooper Draper's testimony, the jury did not have to discount all of it. Likewise, the jury had no obligation to believe Avery's testimony that he felt comfortable driving at the time of the traffic stop and did not use marijuana the day of trial.

{¶35} Generally, each OVI case "is to be decided on its own particular and peculiar facts." *Mentor v. Giordano*, 9 Ohio St.2d 140, 146, 224 N.E.2d 343 (1967). There are some similarities between *Kopp,* which found no probable cause to arrest for OVI, and this case. But there are also facts present in this case which were not in *Kopp*, such as the commission of a traffic violation, statements suggesting a diminished attention span, and refusal to take a chemical test. Some facts we relied on to find probable cause for the OVI arrest in *King* are not present in this case, such as an admission to being under the influence. But there are also facts present in this case which were not present in *King*, such as that Avery admitted to using both alcohol and marijuana, made statements suggesting he had a diminished attention span, and refused to take a chemical test. Likewise, while some facts which supported the OVI conviction in *Cohen* are not present in this case, there are facts present in this case which were not present in *Cohen*, such as the evidence related to marijuana use.

{¶36} After weighing the evidence and all reasonable inferences, considering the credibility of the witnesses after according the requisite deference to the jury's

determinations, we conclude that in resolving evidentiary conflicts, the jury did not clearly

lose its way or create a manifest miscarriage of justice so that we must reverse Avery's

conviction.  This is not the exceptional case where the evidence weighs heavily against

the conviction.  Accordingly, we conclude that Avery's OVI conviction was not against the

manifest weight of the evidence, overrule the sole assignment of error, and affirm the trial

court's judgment.

JUDGMENT AFFIRMED.

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENT IS AFFIRMED and that appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Chillicothe Municipal Court to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed 60 days upon the bail previously posted. The purpose of a continued stay is to allow appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the 60-day period, or the failure of the appellant to file a notice of appeal with the Supreme Court of Ohio in the 45-day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of 60 days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Abele, J.: Concur in Judgment and Opinion.


For the Court


BY: _____
     Michael D. Hess, Judge



### **NOTICE TO COUNSEL**

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**